Gerald KAVENY et al.

v.

TOWN OF CUMBERLAND ZONING
BOARD OF REVIEW.[1]

No. 2003–318–APPEAL.

Supreme Court of Rhode Island.

June 13, 2005.

---

**1.** The caption does not do justice to the original procedural complexity of this case. After the Town of Cumberland Zoning Board of Review's (board) decision on Highland Hills's (Highland Hills) application for a comprehensive permit, various abutting landowners (abutters), including Gerald Kaveny, appealed (No.2003–318–A) directly to this Court. The Town of Cumberland (town), in separate appeals filed by the town solicitor (No.2003–338–A) and town council (No.2003–342–A), also appealed directly to this Court. Highland Hills appealed (No.2004–110–A) the decision and order of the State Housing Appeals Board (SHAB), affirming the board's decision. Several days before oral argument, Highland Hills and the town settled and withdrew their respective appeals (No.2003–338–A; No.2003–342–A; No.2003–410–A). Only the abutters' appeal remains before the Court.

Michael Horan, Esq., Pawtucket, for Plaintiff.

William Landry, Esq., Providence, for Highland Hills LLC.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

WILLIAMS, Chief Justice.

Almost eighty years ago, the United States Supreme Court upheld the power of cities and towns to control land use within their borders as a valid exercise of the police power for the protection of their citizens' public health and welfare. Unfortunately, that same opinion permitted the exclusion of lower-income housing from residential neighborhoods, stating that "the development of detached house sections is greatly retarded by the coming of apartment houses * * * very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

Responding to the ineffectiveness of local land use controls to address the statewide affordable housing crisis in the face of such exclusionary zoning, the Legislature enacted the Rhode Island Low and Moderate Income Housing Act (the act), G.L.1956, chapter 53 of title 45. In doing so, the Legislature concluded, "it is necessary that each city and town provide opportunities for the establishment of low and moderate income housing." Section 45–53–2. In this case, we are asked to resolve a land use conflict arising out of an application to build one such low-and moderate-income housing project in the Town of Cumberland (town).

## I

### Facts & Travel

On or about September 30, 2002, Highland Hills, LLC (Highland Hills or applicants), a private, for-profit, real estate developer, filed an application for a "comprehensive permit"[2] with the Zoning

---

2. "Comprehensive permit" is not specifically defined in the statute. It is "a single application" to build low- and moderate-income housing, filed "in lieu of separate applications to the applicable local boards." G.L.1956 § 45–53–4, as amended by P.L.2002, ch. 416, § 1. Thus it is in the nature of a "one-stop shopping" permit incorporating the requirements of the various local ordinances, includ-

Board of Review of the Town of Cumberland (board), pursuant to § 45–53–4, as amended by P.L.2002, ch. 416, § 1. Highland Hills proposed to build a 343–unit age-restricted condominium development, of which 25 percent (or 85 units) would be reserved for low-and moderate-income buyers, on 97.8 acres located at 30 Old West Wrentham Road. Described as assessor's plat No. 51, lot No. 11, the parcel is adjacent to the existing Highland Industrial Park. It is situated in designated zones A–1 (Agricultural 1) and A–2 (Agricultural 2) public water and public sewer, which permits low-density single-family residential use on parcels of five and two acres, respectively. Traditional subdivision of the parcel, in accordance with the zoning ordinance, with allowances for loss of some acreage due to such factors as wetlands, slope, frontage, roadway and setback, would have yielded approximately thirty to thirty-four residential lots.

Between December 2002 and April 2003, the board held nine public hearings on Highland Hills's application. The applicants, the town, and various abutters presented testimony for and against the project. The lion's share of the proceedings focused on three major issues related to the infrastructural needs and impacts of the project: water, sewer, and traffic.

At the close of the public hearings, the board approved the application for a total of 160 units and attached a set of ten conditions, including a requirement that 20 percent of the units be reserved for low- and moderate-income buyers. A group of abutting landowners (abutters)[3] appealed directly to this Court.

## II
### The Applicable Law

We first pause briefly to pass on the applicability of recent amendments to the act. In P.L.2004, ch. 3, § 1, and P.L.2004, ch. 4, § 1, enacted February 13, 2004, amending § 45–53–4, after the board's decision and the filing of abutters' appeal in this case, the Legislature imposed a moratorium "on the use of the provisions of this chapter by private for-profit developers" until "January 31, 2005." Accordingly, before reaching the merits of the abutters' appeal, we must determine whether the moratorium applies to the present case.

■ We only give statutes retroactive effect when the Legislature clearly expresses such an application. *Pion v. Bess Eaton Donuts Flour Co.*, 637 A.2d 367, 371 (R.I.1994). In this case, we find more than the absence of a clear expression of retroactive application. Rather, the Legislature stated both in the language of the subsection imposing the moratorium and in a general statement of applicability appended to the public laws that the moratorium should have effect "upon passage." P.L.2004, ch. 3, § 1; P.L.2004, ch. 4, § 1 (stating that the "moratorium shall be effective upon passage"); P.L.2004, ch. 3, § 2; P.L.2004, ch. 4, § 2 (stating that "this act shall take effect upon passage"). Accordingly, we conclude that the moratorium applies only to comprehensive permit applications pending on the day the moratorium took effect.

Just six months after enacting the moratorium, the Legislature once again substantially amended the act in P.L.2004, ch. 286, §§ 10–14; P.L.2004, ch. 324, §§ 10–14. These amendments included the same

---

ing, but not limited to, zoning and subdivision.

**3.** The plaintiffs-abutters include the following landowners: Gerald Kaveny; Valerie Kaveny; Witold Kloczkowski; Kimberly Jo Kloczowski; Paul L'Heureux; and Kathleen Reese.

statement that the new amendments "shall take affect upon passage." Considering this language and our general rule on retroactivity, we conclude that, like the moratorium, these new amendments are inapplicable to the present appeal. As such, we apply the law in effect at the time of Highland Hills's application in September 2002.

## III

## The Law and Decisions Below

### A

### The Rhode Island Low and Moderate Income Housing Act

As this Court explained in *Town of Coventry Zoning Board of Review v. Omni Development Corp.*, 814 A.2d 889 (R.I. 2003), "[i]n an effort to promote increased housing opportunities for people with low and moderate incomes, § 45–53–4 of the act provides for a streamlined and expedited application procedure whereby 'a single application for a [comprehensive permit] to build [low and moderate income] housing in lieu of separate applications to the applicable local [municipal] boards' may be submitted to the zoning board of review of a city or town." [4] *Omni Development Corp.*, 814 A.2d at 894 (quoting § 45–53–4) (second and third alterations in original). The act provides that an application may be filed by "[a]ny public agency, nonprofit organization, or limited equity housing cooperative * * * [or] a private developer * * * for low or moderate income housing proposals which remain as low or moderate income housing for a period of not less than thirty (30) years from initial occupancy." Section 45–53–4. The zoning board of review must notify each local board upon receipt of an application, and a public hearing must be held within thirty days of the application. *Id.* The board must "render a decision, based upon a majority vote * * * within forty (40) days after the termination of the public hearing." *Id.* Applications are "deemed to have been allowed" if either the hearing or decision is untimely. *Id.*

In deciding upon an application for a comprehensive permit, the zoning board "has the same power to issue permits or approvals that any local board or official who would otherwise act with respect to the application, including, but not limited to, the power to attach to the permit or approval, conditions, and requirements with respect to height, site plan, size, or shape, or building materials." Section 45–53–4. The act further explains those powers by defining "local board" to mean: "any town or city zoning board of review, planning board or commission, platting board of review, or building inspector; or the officer or board having supervision of the construction of buildings or the power of enforcing municipal building, subdivision, or zoning laws; or the city council or town council." Section 45–53–3(4).

The zoning board may deny the application:

"for any of the following reasons: if the proposal is inconsistent with local needs, including, but not limited to, the needs identified in an approved comprehensive plan, and local zoning ordinances and procedures promulgated in conformance with the comprehensive plan; if the proposal is not in conformance with the comprehensive plan; if the community has met or has plans to meet the standard of ten percent (10%) of the units * * * being low and moderate income

4. In June 2002, the term "special exception" in 45–53–4 was replaced with "comprehensive permit." *See* P.L.2002, ch. 416, § 1.

housing; or if concerns for the environment and the health and safety of current residents have not been adequately addressed." Section 45–53–4.

The act provides for two appeal routes. Denials or approvals with conditions making the project infeasible may be appealed to SHAB, and the subsequent SHAB decisions may be appealed to this Court. Section 45–53–4. Approvals, however, may be appealed directly to this Court.

## B

### The Board's Decision

The board made the following findings of fact based upon the testimony and documentation in the hearing record. We note, however, that the fifth and seventh findings (concerning the allowable density on the property and the consistency of the proposal with the comprehensive plan, respectively) are more in the nature of conclusions of law.

#### Findings of Fact

· "That this project is proposed on 97.8 acres in land that is zoned A1 and A2 public water and sewer.

· "That the Town of Cumberland has not met 10% minimum for low and moderate and does not have a plan to meet the 10%.

· "That the project proposed is to be age restricted 55 and up and that the developer has committed to 25% of the units low and moderate as provided in R.I. General Laws 45–53–1.

· "That said 25% guarantee to low and moderate housing assured by applicant is contingent on the approval of a total of 343 units.

· "That the density on the property as it is presently zoned would, as per the town planner's testimony, would [sic]

allow 30–35 homes, some ten (10) times the density allowed in that Zone.

· "That the Town Engineer and Public Works director, Alan Brodd testified before the board that the available water is for 111 units.

· "That the proposed 343 units are not in conformance with the Comprehensive Plans [sic] proposed use or Zone of the property.

· "That the Town, through its planning department, has worked with the Valley Affordable House for the renovation and redevelopment of existing properties throughout the town and at base of 5.7%.

· "That under the correspondence by Jordan Stone dated August 7, 2002 the petitioner is seeking a waiver by the Town of impact fees.

· "That a traffic study was done by Engineer Northeast Engineering and Consultants and an engineer hired by the Town of Cumberland and said traffic was reviewed by DOT evidencing that although there would be a traffic increase on Mendon Road, there would be no significant impact on the level of service."

Based upon these findings of fact, as well as the applicable laws and regulations, the board made various conclusions of law.

#### Conclusions of Law

· "[T]hat the proposal for 343 units in an A–1 and A–2 zone is inconsistent with the Town's Comprehensive Plan, is inconsistent with local needs, that as a matter of law the Town does apply it's [sic] zoning ordinances on a consistent basis to proposals that are low and moderate income based, as well as those for market value sales.

· "That project at this scale creates excessive density and an unnecessary and

unrealistic burden on the town infrastructure.

· "That a project of 343 units would be excessive and that the petitioner has not proposed adequate information to establish that the town infrastructure can handle that type of capacity.

· "That the magnitude of 343 units would create an impact upon town services rising to the level of directly affecting the health and welfare of town residents.

· "That local needs for low and moderate income living will be furthered by approval of this project but at a density of 160 units; 20% of those to be dedicated to low and moderate income housing." [5]

## IV

## Discussion

On appeal, abutters argue: (1) that the board's conclusion that "local needs for low and moderate income living will be furthered by approval of this project but at a density of 160 units" is arbitrary and void because it is unsupported by findings of fact or evidence on the record; (2) that a 2002 amendment to § 45–53–4 replacing

"special exception" with "comprehensive permit" renders the act unconstitutional because it is without proper standards and guidelines; and (3) that in implementing its rules, SHAB has exceeded the statutory authority provided in § 45–53–4.

## A

## The Sufficiency of the Board's Decision to Permit 160 Units

■ In *Curran v. Church Community Housing Corp.*, 672 A.2d 453, 454 (R.I. 1996), this Court determined that, although the statute provides no explicit standard for direct appeals to the Supreme Court, "our standard of review is analogous to that applied by the Superior Court in considering appeals from local zoning boards." Pursuant to that statement, this Court "may 'not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact.'" *Id.* (quoting G.L.1956 § 45–24–69(d)). The Court "may reverse the decision of the zoning board, however, 'in the event that the decision violated constitu-

---

5. In addition, the board attached ten conditions to its approval of the 160 units:

1. "Applicant must return to this Board as per any subdivision regulations that would apply for a final site plan review, and that this approval per the regulations and ordinances is valid for one year, and, if necessary, applicant shall appear before the Board for an extension of time thereof.

2. "Applicant must supply calculations that conclusively prove that the existing sewer system has the capacity to accept effluent from the development in addition to the predicted flow from the complete buildout of Highland Industrial Park. * * *

3. "Applicant funds and constructs a sewer connection and pump station per the recommendation of Public Works. * * *

4. "Applicant must submit a Buffering Plan for approval prior to the issuance of any building permits.

5. "Applicant must satisfy all requirements for the issuance of building permits as of the time of building permit application with an advisory opinion to be issued by the Building Official and Public Works.

6. "Drainage and utilities to be designed and installed in accordance with Cumberland Subdivision Regulations.

7. "Applicant must provide proof of all state and federal permit approvals prior to any construction.

8. "Applicant must provide proof that subsidies set forth in the eligibility letter have been secured prior to any construction. The comprehensive permit shall lapse upon failure to secure applicable subsidies.

9. "Applicant is allowed water for 111 units but must install a well for the balance of the units up to 160.

10. "No impact fees will be waived."

tional or statutory provisions, that it was made in excess of statutory authority or made upon an unlawful procedure or error of law, was clearly erroneous in view of the evidence, or was [otherwise] arbitrary or capricious.'" *Id.* at 454–55 (quoting *United Cerebral Palsy of Rhode Island, Inc. v. Town of Johnston*, No. 95–116–A. (R.I., filed March 23, 1995) (mem.)) (alteration in original).

This deferential standard of review, however, is contingent upon sufficient findings of fact by the zoning board. We often have stated that "a municipal board, when acting in a quasi-judicial capacity, must set forth in its decision findings of fact and reasons for the actions taken." *Sciacca v. Caruso*, 769 A.2d 578, 585 (R.I.2001) (quoting *Irish Partnership v. Rommel*, 518 A.2d 356, 358 (R.I.1986)). Such findings are necessary so that zoning board decisions "'may be susceptible of judicial review.'" *Bernuth v. Zoning Board of Review of New Shoreham*, 770 A.2d 396, 401 (R.I. 2001). "Those findings must, of course, be factual rather than conclusional, and the application of the legal principles must be something more than the recital of a litany." *Id.* (quoting *Irish Partnership*, 518 A.2d at 358–59). Finally, when the zoning board "fails to state findings of fact, the [C]ourt will not search the record for supporting evidence or decide for itself what is proper in the circumstances." *Id.* (quoting *Irish Partnership*, 518 A.2d at 359).

■ In this case, the board's decision reveals *nothing* about how the board arrived at 160 units. In reviewing the decision, we note that the board's conclusions with respect to various infrastructure problems created by the proposal for 343 units, including lack of public water and sewer, are well supported by the findings of fact. These conclusions, along with the board's findings that public water existed to support only 111 units, obviously support the conclusion that the board could not approve 343 units, but could approve 111 units. Beyond these inferences, the board's decision is utterly lacking in any findings of fact supporting 160 units. Indeed, compared to the specific findings and conclusions with respect to the proposed 343 units, the decision to approve 160 units appears to be completely arbitrary. We require specific findings of fact in zoning board decisions to avoid precisely this situation—where inadequate findings render our task of judicial review impossible. Accordingly, we will abide by our rule that we will not search the record for supporting evidence.[6]

---

6. We note that in considering Highland Hills's appeal, SHAB initially remanded the case for clarification on precisely this issue. The board, however, could not clarify because of changes in its membership after its decision. Following the unsuccessful remand, and, apparently after reviewing the transcripts, SHAB determined that the 160 units was derived from the total units Highland Hills proposed for the first three years, or Phases I through III, of the project. Although, in the absence of specific findings, this provides at least some explanation of the figure, our standard of review does not permit us to "search the record," as SHAB did. *Bernuth v. Zoning Board of Review of New Shoreham*, 770 A.2d 396, 401 (R.I.2001). Nonetheless, a review of the transcripts (April 23, 2003) indicates that the number was in fact quite arbitrary:

"[Board member] McCormick: One question that I still would have is the 160 units.
"[Board member] Bessette: Well, the way I came up with that 160 units was when you add Phase I, II and III up, that was the 160 units.
"* * *
"Mr. Bessette: It can be amended. I mean we had to come up with a number, and I thought that was logical because of the phases that were already there. I mean we had to go with something * * *.
"* * *
"Mr. Bessette: What I'm trying to do is pick out a number that I feel that it would be reasonable for the Town and won't put

In view of the lack of any findings to support the board's approval of 160 units, we hold the board's decision to be fatally flawed. We therefore vacate the board's decision and remand the case for further proceedings consistent with this opinion. On remand, the board should take care that its findings of fact are clearly set forth in its decision, referring to the evidence presented, and that its conclusions of law are properly supported by the findings of fact. The board shall confine its review to the existing facts and applicable law at the time of its initial decision. The board shall render its decision as expeditiously as possible and, in no event, beyond ninety days after the entry of this opinion. Despite our holding, we, nonetheless, address the additional issues raised by the parties, as they are sure to appear before this Court again.

## B

### Murky Constitutional Claim

■ In a less than crystal clear argument, abutters claim the 2002 amendment (P.L.2002, ch. 416, § 1) to § 45–53–4, replacing "special exemption" with "comprehensive permit" renders the act void because it fails to set forth any standards or criteria for approval.[7] Therefore, abutters

---

that much of a burden. I realize it's still going to be somewhat of a burden to the Town, but I'm just trying to think of a number, and that's where I came up with that."

Our standard of review requires that the board *at least* articulate *some findings* to support its conclusions. That they were trying to "pick out a number" that was "logical," without more, is not sufficient.

7. We pause briefly to discuss a procedural issue of some importance. The general rule in our state is to notify the Attorney General of constitutional claims. For example, Rule 24(d) of the Superior Court Rules of Civil Procedure requires a party raising the constitutionality of a statute to notify the Attorney General. Likewise, G.L.1956 § 9–30–11 requires similar notice by a party seeking declaratory relief based on the allegation that a statute is unconstitutional. We have, further, held this requirement applicable to actions not styled in the nature of declaratory relief. *See Granoff Realty II Limited Partnership v. Rossi,* 833 A.2d 354, 359–60 (R.I.2003) (action challenging City of Providence tax assessment pursuant to G.L.1956 § 44-5-26); *Crossman v. Erickson,* 570 A.2d 651, 654 (R.I. 1990) (action by co-administrators and heirs-at-law to void the conveyance of certain real estate by conservator of deceased's estate prior to her death).

Our appellate rules require a party raising constitutional issues in this Court to follow a similar, but different, procedure. Article I,

Rule 32(b) of the Supreme Court Rules of Appellate Procedure requires such a party to "give immediate notice in writing to the Supreme Court of the existence of said question," and further provides that "[t]he clerk of the Court shall thereupon certify such fact to the Attorney General."

Given that this case follows a unique and abbreviated route to our courtroom—without the customary visit to Superior Court—adherence to Rule 32(b) is of particular importance because of the likelihood that cases such as this one otherwise might escape the Attorney General's cognizance. In this case, there is no evidence in the record of abutters' compliance with either § 9–30–11 (as interpreted by the above cases) or Rule 32(b). At oral argument, abutters' attorney, however, represented to this Court that he had given the Attorney General the appropriate notice. In any case, whatever notice was provided obviously falls short of the procedure required by Rule 32(b).

Nonetheless, because of our disposition of abutters' constitutional claims, we need not dismiss this appeal. *See Power v. City of Providence,* 582 A.2d 895, 901 n. 6 (R.I.1990) (declining to dismiss constitutional claims despite noncompliance with applicable notice rules in both Superior and Supreme Courts when the Court's decision ultimately upheld the act in question, but noting that, had the Court determined otherwise, the claim would have been dismissed). Given the drastic remedy for failing to comply with these rules, we suggest that, in the future, parties should endeavor to achieve more zealous compliance.

argue, the act is without proper guidelines to meet constitutional standards for due process and equal protection of the law. Abutters further argue that the lack of such a standard renders the board's decision granting the permit arbitrary and capricious.

■ "Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Wilkinson v. State Crime Laboratory Commission,* 788 A.2d 1129, 1131 n. 1 (R.I. 2002); *see also* Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure. Unfortunately, in this case, abutters have included no citation to support their constitutional argument(s), leaving the Court to guess what authority to apply. Their argument with respect to standards "rings" with the sound of nondelegation of legislative power, but no citations are provided. At the same time, abutters boldly argue that the act cannot meet constitutional muster for due process and equal protection, again, without citation. Because the Court cannot decipher what law to apply to abutters' constitutional arguments, they are waived.

■ Nonetheless, the Court will briefly analyze abutters' claims according to the various constitutional provisions they *might have* intended to invoke. In mounting constitutional challenges, litigants, including these abutters, bear the burden of proving that the statute is unconstitutional. *Gem Plumbing & Heating Co. v. Rossi,* 867 A.2d 796, 808 (R.I.2005).

■ We begin our analysis with due process and equal protection. There is no question here that the law called for, and the board provided, proper notice and an adequate hearing. *See Trembley v. City of Central Falls,* 480 A.2d 1359, 1365 (R.I. 1984) (noting that "the fundamental [procedural] protection afforded by the due-process [*sic*] clause of the Fourteenth Amendment is the opportunity for an individual aggrieved by certain governmental conduct to be heard 'at a meaningful time and in a meaningful manner'"). Rather, abutters appear to argue that § 45–53–4 is unconstitutionally vague because it fails to define the standards or guidelines for approving a comprehensive permit, and therefore violates the constitutional protections of due process. A statute is unconstitutionally vague if it compels "a person of average intelligence to guess and to resort to conjecture as to its meaning and/or as to its supposed mandated application." *Trembley,* 480 A.2d at 1365; *see also Bourque v. Dettore,* 589 A.2d 815, 822–23 (R.I.1991). This is not the case with § 45–53–4. The statute states clearly what grounds exist for a *denial* of the permit. For whatever reason, the Legislature, in its wisdom, decided to proceed with a statutory term that is defined by negative implication. For purposes of this inquiry, that is enough to take the statute out of the realm of those laws that are unconstitutionally vague.

■ Substantive due process "guards against arbitrary and capricious government action." *Brunelle v. Town of South Kingstown,* 700 A.2d 1075, 1084 (R.I.1997). To make out a violation of substantive due process, abutters must establish that the challenged provisions are "'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" *Id.; see also Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

■ In this case, the act has a "substantial relation" to such proper legislative purposes. In the act's findings, the Legis-

lature declared that "the provisions of [the act] are necessary to assure the health, safety, and welfare of all citizens of this state, and that each citizen enjoys the right to affordable, accessible, safe, and sanitary housing." Section 45–53–2. At a bare minimum, the act creates a mechanism to "fast-track" such housing projects. We cannot say that it has no relation to these valid legislative purposes. Nor can we say that it attempts to reach these purposes by unreasonable means. Thus, it does not violate substantive due process.

■ With respect to equal protection, "[i]t is well established that where it has not been shown that a 'fundamental right' has been affected or that the legislation sets up a 'suspect classification,' a statute will be invalidated * * * only if the classification established bears no reasonable relationship to the public health, safety, or welfare." *Sweetman v. Town of Cumberland,* 117 R.I. 134, 151, 364 A.2d 1277, 1288 (1976). Abutters can point to no suspect classification made or fundamental right affected by § 44–53–4, nor are they members of a " 'discrete and insular minority' " entitling them to such a classification. *Trembley,* 480 A.2d at 1366 (quoting *Regents of the University of California v. Bakke,* 438 U.S. 265, 290, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and *United States v. Carolene Products Co.,* 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). Accordingly, because the statute is directed at and bears a reasonable relationship to public health, safety, or welfare, discussed *supra,* it does not violate the equal protection clause.

Finally, we turn to the nondelegation doctrine. In this respect, we interpret abutters' argument as alleging that the act violates the nondelegation doctrine because it fails to include a standard for approving comprehensive permits.

■ "The Rhode Island Constitution forbids unrestricted delegations of legislative power by the General Assembly." *Marran v. Baird,* 635 A.2d 1174, 1179 (R.I.1994). In Rhode Island, the nondelegation doctrine is derived from article 6, sections 1 and 2 of the Rhode Island Constitution, which provides that "[t]his Constitution shall be the supreme law of the state" and that "legislative power, under this Constitution, shall be vested in * * * the [G]eneral [A]ssembly." The doctrine serves the dual purposes of protecting the "citizens against discriminatory and arbitrary actions of public officials, * * * and the assurance that duly authorized, politically accountable officials make fundamental policy decisions." *Marran,* 635 A.2d at 1179.

■ We have not, however, interpreted this doctrine to prevent all delegation of legislative power. To the contrary, "because the General Assembly must confront modern problems of ever-increasing complexity, strict adherence to the nondelegation doctrine would detrimentally inhibit the Legislature's ability to execute its constitutional duties." *Id.* As such, "reasonable" delegations do not violate the nondelegation doctrine. *Id.* A delegation is reasonable as long as the Legislature provides "standards or principles to confine and guide" interpretation. *Id.* (quoting *Davis v. Wood,* 427 A.2d 332, 336 (R.I. 1981)).

For essentially the same reasons that the statute is not unconstitutionally vague, *supra,* we think it satisfies the nondelegation doctrine. Quite simply, the act is not without "standards or principles" to aid zoning boards in deciding on comprehensive permit applications. To abutters' dismay, the Legislature opted to define the situations where a zoning board may deny a permit, leaving the approval standard to negative implication. Although this ap-

proach may make the work of zoning boards more analytically difficult, they have not been "set adrift without any rudder." *Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737, 749 (D.D.C.1971). Accordingly, abutters' nondelegation argument must fail.

## C

### SHAB's Regulations

We next consider abutters' claim that § 3.02 of SHAB's Rules Implementing the Rhode Island Low and Moderate Income Housing Act exceed their statutory rule-making authority by arbitrarily establishing a minimum percentage of low- and moderate-income units in an otherwise qualified project.

Section 45–53–4 provides that: "[t]he chair of the state housing appeals board shall, by regulation, provide for review by planning boards in cases of applications involving land development projects or subdivisions." Pursuant to that rulemaking power, SHAB promulgated various rules implementing the act, including § 3.02, which is a subset of § 3.00, entitled "Procedure to Apply to the Zoning Board of Review for a Comprehensive Permit for Low and Moderate Income Housing." Section 3.02 states that:

"Projects are eligible if sponsored by an eligible entity and:

(i) are eligible for a subsidy from the state or federal government under any program to assist the construction or rehabilitation of low and moderate income housing; and

(ii) have at least the minimum number of units reserved for low and moderate income housing as defined by the program providing the subsidy or twenty percent (20%) of the total number of units reserved for low and moderate income housing, whichever is greater."

Abutters concede in their brief that this appeal pertains only to the zoning board's decision and make no allegation that SHAB's regulatory 20 percent requirement has anything to do with that decision. At the same time, they blithely soldier on and apparently correlate this percentage with the statutory 10 percent minimum, §§ 45–53–3(2); 45–53–4, and conclude that SHAB has exceeded its authority. While the board did require that 20 percent of the units should be reserved for low and moderate income, there are no findings or evidence indicating conclusively that their decision to *reduce* the percentage of reserved affordable units in the application *from* 25 percent to 20 percent was in anyway related to the regulations. Having failed to persuade us that the regulations are even involved in this matter, it would be *improper* for this Court to consider abutters' challenge in the present appeal.[8]

### Conclusion

For the reasons stated herein, we vacate the decision of the board and remand the

---

8. When the question is ultimately the validity of a duly adopted regulation, rather than an agency decision in a "contested case," the mechanism for such a challenge is an action *for declaratory judgment in Providence County* Superior Court, pursuant to G.L.1956 § 42–35–7. *Compare* § 42–35–15(a) (affording judicial review of agency decisions in "contested cases") *and* § 42–35–1(c) (defining "[c]ontested case" as "a proceeding * * * in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for a hearing") *with* § 42–35–7 (stating that "[t]he validity or applicability of any rule may be determined in an action for declaratory judgment in the superior court of Providence County, when it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff").

case for further proceedings consistent with this opinion. We reiterate that, in its resolution of this matter, the board should take care that its conclusions of law are properly supported by findings of fact based upon substantial evidence. The board shall confine its review to the existing facts and applicable law at the time of its initial decision. We are mindful and concerned that this application initially was filed almost three years ago. Therefore, the board shall render its decision as expeditiously as possible, and in no event beyond ninety days after the entry of this opinion.

Justice GOLDBERG did not participate.