[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is an appeal of a decision by the Coastal Resources Management Council ("CRMC"). The appellants ("Riesman" or "Spiratos") object to the CRMC's decision designating a 30-foot wide parcel of land ("right-of-way") as a public right-of-way. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 FACTS AND TRAVEL
The CRMC is an administrative agency created to protect Rhode Island's coastline and coastal wetland resources. See G.L. 1956 § 46-23-1 et seq.
One of its responsibilities is to explore and designate public rights-of-way to the tidal water areas. Id. The CRMC created a right-of-way subcommittee ("subcommittee") to investigate, hold public hearings, and act as initial factfinder to determine whether public rights-of-way exist. See Sartor v. CRMC, 542 A.2d 1077, 1078-79, 1081-82
(R.I. 1988); see also § 46-23-20.
The appellants are abutting waterfront property owners on Tuckerman Avenue in Middletown, Rhode Island. The Riesmans acquired their plot, designated as Lot 104 on Middletown Tax Assessor's Plat 116 SE ("Lot 104"), in 1981. The Spiratos have owned the property to the immediate south of the Riesmans' land — Lot 105 on the same plat ("Lot 105") — since 1945. Between Lots 104 and 105 runs a 30-foot wide, and approximately 400-foot long, parcel of land from Tuckerman Avenue to the Atlantic shoreline. It is this right-of-way that was at issue before the CRMC.
The subcommittee first considered the instant right-of-way at a hearing on August 28, 1980. At this hearing, the subcommittee surveyed the following evidence and recommended to the full council that the parcel was, as a matter of law, a public right-of-way.
Attorney Ronald Markoff ("Markoff") conducted a title search of Lots 104 and 105. In his title report, Markoff notes that each of the deeds conveying Lot 105 through the chain of title — beginning with a deed from Helen L. Deas, widow of Zachariah Deas, to Clara V.M. Sweet dated December 28, 1897 — contains the following description of the plot's northern boundary line: "[S]aid northern boundary line being the center line of a way thirty (30) feet wide running from Tuckerman Avenue to Ocean." (February 25, 1980 Title Report by Markoff.) Further, he highlights specific language in the title deeds to Lot 104, clarifying that "the conveyance is subject to an easement of record." Id. Markoff concludes that "[a]s this right of way is very old . . . other persons, including the public at large, may have been using said right of way," and that "the public may be able to assert an interest therein." Id.
In addition to the title report, the subcommittee also reviewed a legal description and drawn survey of the two lots compiled by an engineering firm. Said documents showed a right-of-way running from Tuckerman Avenue to the top of a bank, down 15 feet to the bottom of the bank, and then to the shore.
Finally, the subcommittee heard testimony from a number of interested parties, including the appellants, neighbors, and other members of the public. An area fisherman testified that he and other fishermen had used this right-of-way to access the shoreline for approximately 50 years. (August 28, 1980 Hearing Tr. at 43.) Only recently, he added, were they told to keep out. Id. "[A]ll of a sudden they want to stop [us], and this is one of the best spots for fishing on the island." Id. Similarly, another local fisherman told the subcommittee that he had "gone down to this area fishing with [his] father when [he] was just a young fellow."Id. at 45. Furthermore, a 55-year-old neighbor testified that he had fished in that spot all of his life; that "we used to go fishing down there with my grandfather and stayed with the same spot . . . and all of a sudden it's going to be closed." Id. at 46. The neighbor added that the appellants' actions represented "the first hassle that [has] come up, so far as I am concerned I consider that a right of way." Id.
Moreover, a former Middletown councilman testified that, while serving in that office, he had introduced a resolution providing that the instant right-of-way was, in fact, an "access" right-of-way, and that, in his estimation, it was an "open" access. Id. at 48. The witness also noted that, as councilman, he had removed a `no parking' sign located on Tuckerman Avenue adjacent to the instant right-of-way so fishermen could park on the street and walk down to the waterfront, as opposed to "penetrating the right of way with the[ir] cars." Id.
The subcommittee also heard testimony from the appellants, Mr. and Mrs. Anthony Spiratos. Anthony Spiratos indicated that he, as well as previous owners of Lot 105, constantly put up signs in an effort to keep the public from using the right-of-way. Id. at 51. Mary Spiratos accentuated the problems they had in this context, explaining to the subcommittee that "for the last 35 years I've had trouble with the cars going down . . . almost to the waterfront, two, three cars at a time, with all kinds of parties, drinking, and I called the police several times." Id. at 39-40. Mr. Spiratos did acknowledge, however, that in or around 1920 "the house stayed closed for 25 years and those 25 years everybody had access to [the right-of-way]." Id. at 52.
The full council heard this matter on May 14, 1981. At the outset, the chairman of the subcommittee tendered the following findings to the council: "Based upon the Title Attorney's report and evidence of the [s]ubcommittee hearing, it appears that this is a public right-of-way; and I, therefore, recommend that this be designated as a public right-of-way and so move." (May 14, 1981 Hearing Tr. at 3-4.) No new evidence was offered at this time, and the council adopted the subcommittee's recommendation.[1]
On June 17, 1981, the CRMC rendered its written decision, which contained the following findings of fact:
 "1. Evidence presented at the [s]ubcommittee hearing indicated that surrounding conveyances, beginning with a deed from Helen L. Deas, widow of Zachariah L. Deas to Clara V.M. Sweet dated December 28, 1897 and recorded in Book 17 at Page 576 in the Land Records of the Town of Middletown mention a certain line of way running from Tuckerman Avenue to the Ocean.
 "2. Evidence at the [s]ubcommittee hearing indicated that there had been considerable usage by the general public over a long period of time, going back at least fifty years.
 "3. The title opinion, and the report of the engineer, all reviewed by Council's legal counsel established that there had been a dedication of a right-of-way in the deed of December 28, 1897 from Helen Deas to Clara Sweet which was reaffirmed in a deed from Clara V.M. Sweet to the present owners, dated August 14, 1945 and recorded in Book 39, at page 593. Said dedication being as follows: ("Bounded northerly on land now or lately of Mary J. Channing, said northern boundary line being the center line of a way, thirty (30) feet wide running from Tuckerman Avenue to the Ocean.")." (June 17, 1981 Decision of the CRMC at 1.)
Given these findings of fact, the council then submitted the following conclusions of law:
 "1. This Coastal Resources Management Council has been granted jurisdiction to designate public Right-of-Ways by reason of Title 46, Chapter 23 of the General Laws of the State of Rhode Island as amended.
 "2. In accordance with the Rhode Island Supreme Court case of Robidoux vs. Pelletier, 391 A.2d 1150 there has been an incipient dedication of a right-of-way and sufficient usage of this Right-of-Way by the public.
 "3. The record reflects that the evidentiary burdens of proof, as set forth in the Right-of-Way Subcommittee regulations have in fact been met for the designation of this parcel as a right-of-way.
 "4. The evidence as submitted by the title attorney, the appraiser and the engineer and so reviewed by the Council's legal counsel establishes that this parcel is a public right-of-way by incipient dedication and usage." Id. at 1-2.
The Riesmans filed a timely appeal of the decision in this Court on the grounds that they had not received notice of the hearing. In 1990, the Court remanded the matter to the CRMC to hold a new public hearing and render a new decision.
Accordingly, the subcommittee held a second hearing on January 27, 1993. On this occasion, it received into evidence, without objection, a report entitled "Potential Right-of-Way Attorney's Review," compiled by CRMC counsel Jeanne L. Shepard ("Shepard"). In her report, Shepard indicates that she had reviewed the testimony from the prior hearings, as well as Markoff's title report and the relevant land records and tax assessor's records. (August 25, 1992 Attorney Report by Shepard.) Shepard concludes the following:
 "[T]his right of way was established in 1872 by dedication by deed of Lucius Tuckerman to Mary Channing which referred to the way and carriage turn running from Tuckerman Avenue to the Ocean, said way being 30 feet in width. This dedication by deed was further reinforced by the adjoining lots deed from Helen L. Deas to Clara V.M. Sweet dated December 28, 1897, referring to a way 30 feet in width running from Tuckerman Avenue to the Ocean. The right of way was also offered by implied dedication by the recording and of the various plat maps in 1872, 1879 and 1945. The implied dedication of the right-of-way was long-ago accepted by the public as evidenced by the testimony at the previous public hearings.
 "Therefore, it is this attorney's opinion that the right of way lying between Lots 104 and 105 on Assessor's Plate 116SE constitutes a public right of way to the Atlantic Ocean running 400 feet from Tuckerman Avenue, in the Town of Middletown to the Ocean." (August 25, 1992 Attorney Report by Shepard at 4-5.)
Furthermore, with respect to the physical appearance of the right-of-way, Shepard inspected the area personally and notes in her report that "a bramble hedgerow and dense high shrubbery have completely overgrown the way as well as blocked all access. In fact, the bramble hedgerow and shrubs are so dense, the chain link fence is not readily visible from the street." Id. at 4.
At the same hearing, the appellants submitted into evidence an Affidavit from Mr. and Mrs. Riesman, stating their objection to the CRMC's proposed course of action. (January 19, 1993 Affidavit at 2.) The Affiants made the following statements: That since January, 1981 — when they purchased Lot 104 — there has been no public use of the property; that they at all times paid taxes on the property and were responsible for its upkeep; that no mention had ever been made of this public right-of-way until the CRMC made its designation in 1980; that the town had posted signs providing `not a public way' adjacent to the parcel at issue; that the owners of Lot 105 installed `private property' and `no trespassing' signs along the right-of-way; and that they are aware of a separate, nearby right-of-way commonly used by the public to access the shore. (January 19, 1993 Affidavit at 2-3.)
Subsequent to presenting the Riesmans' Affidavit, Mr. and Mrs. Spiratos testified as to the public's use of the right-of-way. Mr. Spiratos told the subcommittee that he had never granted permission to the general public to use the right-of-way. (January 27, 1993 Hearing Tr. at 15.) To the contrary, he complained that there had been a number of occasions whereon people had torn down various fences and signs he had constructed to fend off trespassers. Id. at 16, 18. Likewise, Mrs. Spiratos testified that "many signs were put up", but "[t]hey were destroyed every time."Id. at 20.
The subcommittee also heard testimony from the appellants' counsel regarding the physical dimensions of the right-of-way. He suggested that the right-of-way did not travel the length of the lots, but, rather, it stopped short of the coastline. Specifically, he argued that the 1879 deed conveying Lot 104 from Mary J. Channing to Annie L.K. Horton — as well as plat maps referenced by that deed — show that the right-of-way runs from Tuckerman Avenue to a carriage turn situated well short of the ocean. Id. at 21-22. In further support of their argument, the appellants maintain that nearly all of the deeds and the plat maps in connection with Lots 104 and 105 evidence that the right-of-way actually travels only to this carriage turn. Id. at 20-22.
Additionally, the appellants introduced evidence of a deed concerning a third parcel of land located near Lots 104 and 105, and similarly situated — bordered by Tuckerman Avenue on one boundary, and the Atlantic Ocean on the other. Id. at 24. This deed, from Lucius Tuckerman to Henry Asher Robbins, dated August 24, 1872, mentions a right-of-way and specifically provides that this "way shown on the easterly boundary thirty feet in width, [is] to be kept open for free access to the cliffs and ocean."[2]
The subcommittee also heard abundant testimony from neighbors, local fishermen, and other interested parties relative to the extent the public had used the right-of-way over the years, similar to that it heard in the original, 1980 hearing. One fisherman testified that he "used that place for fishing in the beginning of the fifties, right up until the fence was put up" in or around 1981. Id. at 28. "I fished there for years and a lot of people fished there for years and nobody ever said it was a private way. We all took it for a [public] right-of-way." Id. at 29. Similarly, a neighbor alluded to his experiences in the 1940s, when he "used to go with the soldiers on the tour . . . and one of the places that we used to walked down to the shore, was on that right-of-way." Id. at 30. Moreover, this neighbor told the subcommittee that, as a fireman, he and his co-workers used the right-of-way on several occasions, "until recently . . . when the fence was put up and everybody was blocked from it." Id. at 30. Finally, the subcommittee considered the deposition testimony of the then Middletown Police Chief, who recognized that the right-of-way had become "an overgrown area . . . all covered over with brush." (January 11, 1983 Deposition Tr. at 7.) Further, when asked about the public's use of the right-of-way, the Police Chief testified that cars would park along Tuckerman Avenue, and that "[he] see[s] cars parked there all the time, eight or nine months a year." Id. at 9.
The subcommittee also received into evidence engineered maps from 1907 and 1933, respectively. Said maps depicted the right-of-way traveling in a westerly direction, from Tuckerman Avenue to the Atlantic Ocean.
On April 27, 1993, the subcommittee held a public workshop and recommended to the full council, once again, that the parcel be designated as a public right-of-way extending to the shoreline, which the full council subsequently adopted as its findings. (May 11, 1993 Hearing Tr. at 120.) On August 25, 1993, the CRMC issued a written decision which contained 27 findings of fact. These findings delineate the procedural history of the matter and highlight, in great detail, the evidence that the subcommittee used in making its evaluation. (August 25, 1993 Decision of the CRMC at 2-7.) Finding 27 provides that "[b]ased on the foregoing, substantial evidence exists to designate this parcel as a public right-of-way to the shore of Rhode Island." Id. at 6-7. Consequently, the full council concluded that, as a matter of law, "[t]he record reflects that the evidentiary burdens of proof have in fact been met for the designation of this parcel as a public right-of-way." Id. at 7.
Once again, the Riesmans filed a timely appeal to the Superior Court, this time predicated on the discovery of new evidence material to the proceeding — namely that Markoff, in preparing his 1980 title report of the two lots, did not have access to the original deeds creating the right-of-way. (See Memorandum of Law In Support of Plaintiffs' Motion to Present Additional Evidence at 3.) The Court granted the appellants' motion, issuing a stay of the CRMC decision, and remanding the case to allow the parties to depose Markoff relative to this newly discovered evidence. (See June 21, 1994 Order.)
Markoff was deposed on October 21, 1999. He was shown three deeds — the September 5, 1872 deed from Tuckerman to Channing conveying Lot 104, the December 28, 1897 deed from Deas to Sweet conveying Lot 105, and the August 24, 1872 deed from Tuckerman to Robbins conveying the Clambake Club property — as well as the plat maps referenced by those deeds. The appellants asked Markoff whether the language in the deed conveying the Clambake Club property — that the right-of-way was to be kept open for free access to the ocean — had any effect upon his initial findings concerning the grantor's intentions regarding the instant right-of-way. (October 21, 1999 Deposition Tr. at 11-12.) He responded that "[i]t could be inferred, after reviewing those deeds and the Clambake Club deed . . . that the intent was to only go to the end of the cul-de-sac which would have been short of the cliffs and ocean." Id. at 12. Therefore, Markoff maintained, "that's the reason why I think you have to read both the words and the map together, so that they don't necessarily conflict with each other." Id. at 12-13.
The subcommittee once again convened on November 9, 2000, incorporating Markoff's deposition transcript into the record. After reviewing this transcript alongside all of the other evidence already in the record (as discussed supra), the subcommittee concluded that Markoff had not changed his opinion; that the evidence revealed an incipient dedication of the right-of-way. With respect to Markoff's deposition testimony, the subcommittee responded as follows:
 "All he said was, it's possible that something else could be, but he did not change his opinion. He just simply said there are other possibilities, there's other avenues here, an abundance of evidence to indicate that there's a right-of-way, and in fact, the right-of-way itself mentions that it's to the shore." (Administrative Record Tr. at 391.)
The subcommittee produced yet another written recommendation to the full council containing 29 findings of fact, similar to that which it had previously submitted. On May 14, 2002, the full council held a meeting at which it deliberated over the entire record and all the evidence therein, including the subcommittee's recommendations, before voting unanimously to designate this parcel as a public right-of-way to the shoreline. The CRMC issued its final, written decision on August 8, 2003. The appellants then renewed their appeal to the Superior Court on August 14, 2003.
 STANDARD OF REVIEW
When reviewing CRMC decisions, this Court must apply the standard of review set forth in G.L. 1956 § 42-35-15(g):
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing an agency decision pursuant to § 42-35-15, the Court may not substitute its judgment for that of the agency with respect to credibility of witnesses or the weight of evidence concerning questions of fact. Ctr. for Behavioral Health, R.I., Inc. v. Barros, 710 A.2d 680,684 (R.I. 1998). Therefore, the Court is confined to "an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." Johnston AmbulatorySurgical Assocs., Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000) (quotingBarrington Sch. Comm. v. R.I. State Labor Relations Bd., 608 A.2d 1126,1138 (R.I. 1992)); see also Newport Shipyard v. R.I. Comm'n for HumanRights, 44 A.2d 893, 896-97 (R.I. 1984). Competent or substantial evidence is that which a reasonable mind might accept to support a conclusion. Newport Shipyard, 44 A.2d at 897 (quoting Caswell v. GeorgeSherman Sand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)).
Moreover, the Court must accord heightened deference to a CRMC decision adopting the recommendations of its factfinding subcommittee, which made credibility determinations. Envtl. Scientific Corp. v. Durfee,621 A.2d 200, 207-08 (R.I. 1993). Under this two-tiered standard of review, such deference is warranted because the CRMC has already reviewed the subcommittee's findings, and the farther away an official is "when he or she evaluates the adjudicative process, the more deference should be owed to the factfinder." Id. at 208.
 THE RIGHT-OF-WAY
The appellants' contend that the CRMC's finding that the landowners intended to transfer an interest in their property was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Therefore, the appellants maintain that the finding was arbitrary, capricious, and representative of an abuse of discretion.
With respect to designating public rights-of-way, it is well-settled that "[i]n order for there to be an effective dedication, two elements must exist; (1) a manifest intent by the landowner to dedicate the land in question, called an incipient dedication or offer to dedicate; and (2) an acceptance by the public either by public use or by official action to accept the same on behalf of the municipality." Robidoux v. Pelletier,120 R.I. 425, 433, 391 A.2d 1150, 1154 (1978) (citations omitted). The landowner's intent is purely a fact question resolved by evaluating his or her words and conduct. Id.
The appellants maintain that the evidence in the instant record shows that the original grantor of Lots 104 and 105, Lucius Tuckerman, did not intend to dedicate this right-of-way to the public. His intentions can be gleaned, argue the appellants, from examining the particular language of the relevant deeds. (January 27, 1993 Hearing Tr. at 40-41.) Mr. Tuckerman conveyed these two lots, as well as a third similarly situated lot, at approximately the same time. The appellants note that while the deed conveying this third parcel — property currently owned by the Clambake Club — makes specific reference to a right-of-way "to be kept open for free access to the Cliffs and Ocean," no such language exists in the deeds concerning Lots 104 and 105. (August 24, 1872 Deed from Tuckerman to Robbins.)
The appellants rely on Volpe v. Marina Parks, 101 R.I. 80, 220 A.2d 525
(1966). In Volpe, the Rhode Island Supreme Court interpreted a grantor's intent by reviewing the relevant plat maps and deed language and concluded that a dedication had taken place, albeit not to the extent the trial court had found. Volpe, 101 R.I. at 85, 220 A.2d at 529. The Volpe
Court reduced the size of the property to be dedicated to the public, finding it determinative that the grantor of property included language specifically allowing for public use in one deed while leaving similar language out of another deed. Volpe, 101 R.I. at 88, 220 A.2d at 530. "This deed demonstrates conclusively that [the grantor] was well aware of the manner of dedicating his property for the public use and the extent thereof." Id. Accordingly, in the case at bar, the appellants maintain that Lucius Tuckerman's intentions can be garnered from the disparate language in the deeds conveying the three parcels, as discussed above. In other words, by specifically permitting free access to the ocean in one deed, the grantor intended to restrict that access in the others. (January 27, 1993 Hearing Tr. at 41.)
While Volpe does instruct this Court to examine the language of the deeds in determining whether a public dedication has taken place, our Supreme Court emphasizes that said examination is merely one aspect of the overall analysis needed in this context. The Court, in Volpe, was "concerned [with] determining [the grantor's] intent as it can be construed from the various documents he executed." Volpe, 101 R.I. at 85,220 A.2d at 529. The Volpe Court took into account all of the relevant deeds and plat maps, as a whole, to determine the grantor's intent. Id.
This process comported with the policy of encouraging judicial review of public dedications to embrace plat maps and other like depictions; to scrutinize every line, figure, and letter; and to draw conclusions as well as make inferences from these plats. Robidoux, 120 R.I. at 434,391 A.2d at 1154-55. Notably, "[i]t is well settled that when a plat is recorded with streets delineated thereon and lots sold with reference to the plat there is, so far as the public is concerned, an incipient dedication of such streets." Volpe, 101 R.I. at 85, 220 A.2d at 529
(citations omitted).
When this Court reviews agency decisions pursuant to § 42-35-15, it must uphold the agency's findings so long as competent evidence exists in the record. See Barrington Sch. Comm. v. Rhode Island State LaborRelations Bd., 608 A.2d at 1138. In the matter at bar, the record contains ample, competent evidence to sustain the CRMC's finding that the grantor intended to make a public dedication of this right-of-way. The CRMC relied on Markoff's title report, Shepard's attorney report, the language of the various deeds conveying Lots 104 and 105, and a wide array of plat maps and engineered depictions of the right-of-way in making this determination. (See supra.) It reviewed all the pertinent documents and took its inferences therefrom. "The term `dedication' . . . is a term of art. It refers to a transaction whereby a landowner offers a passageway for use by the public." Sartor, 542 A.2d at 1083. The maps, including those professionally done by engineering firms and the plat maps, evidence that the right-of-way veers directly off Tuckerman Avenue — essentially as an extension of the public road — and runs to the coastline. (See Administrative Record at 81, 87.) Consequently, its decision that an incipient dedication had taken place was founded in reliable, probative, and substantial evidence and was not arbitrary, capricious, or representative of an abuse of discretion.
The appellants further contend that Markoff, in fact, changed his opinion with respect to the original grantor's intentions upon reviewing the newly discovered language in the original deed conveying the property currently owned by the Clambake Club. Thus, the appellants argue that the 1980 report did not constitute reliable evidence. In his 1980 title report, Markoff concludes that the public may be able to assert an interest in the right-of-way based on his review of the relevant deeds and plat maps. (February 25, 1980 Title Report by Markoff.) The appellants argue, however, that this conclusion was reached without his having access to the 1872 deeds characterized by the disparate language concerning free access to the ocean, as discussed supra. At his deposition nearly twenty years later, with the benefit of having reviewed that particular language, Markoff testified that it is possible to infer that Tuckerman's intent was that the instant right-of-way was to end at the carriage turn, short of the cliffs and the shoreline. (October 21, 1999 Deposition Tr. at 12-13.) However, Markoff viewed this newly discovered evidence merely as one of many potential indicators in determining Lucius Tuckerman's intent. (See Volpe, 101 R.I. at 85-88,220 A.2d at 529-30 (discussing various documents analyzed by the Court to determine grantor's intent.)) The CRMC did have before it any kind of definitive conclusion from Markoff regarding whether an incipient dedication had taken place. Accordingly, the CRMC's consideration of the 1980 report was not clearly erroneous.
Additionally, the appellants argue that the CRMC's finding that the right-of-way extends from Tuckerman Avenue to the Atlantic Ocean shoreline was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. The appellants claim, therefore, that the CRMC's finding was arbitrary, capricious, and representative of an abuse of discretion because the evidence in the record supports a finding that the right-of-way at issue simply does not reach the cliffs or the shoreline of the Atlantic Ocean. Consequently, they maintain, the grantor of Lots 104 and 105 could not have intended to dedicate this right-of-way for access to the ocean.
The agency had before it reliable, probative, and substantial evidence in the record to support its finding that "the deeds for Lots 104 and 105 clearly state that the right-of-way in question is `30 feet wide running from Tuckerman Avenue to the Ocean.'" (August 25, 1993 Decision of the CRMC at 5.) The deed originally conveying Lot 105 provides that the lot is "bounded northerly on land now or lately of Mary J. Channing, said northern line being the center line of a way 30 feet wide running from Tuckerman Avenue to the Ocean." (December 28, 1897 Deed from Deas to Sweet.) Each of the subsequent deeds which purport to convey Lot 105 contains the same or similar dimensional language. Likewise, each of the deeds in the chain conveying title to Lot 104 describes the lot's southerly boundary as follows: "[S]aid southerly boundary being the centre of a way and carriage turn, and so continued, running from Tuckerman Avenue to the Ocean, said way being 30 feet in width." (September 5, 1872 Deed from Tuckerman to Channing.)
In addition, the CRMC was able to survey a number of illustrated depictions of the right-of-way, including plat maps referenced by the deeds, as well as engineering plans from 1907 and 1933. (See description of evidence, supra.) The appellants claim that the plat maps and other illustrations show that the right-of-way does not extend to the shoreline. Admittedly, there exist a number of maps in this instance, each drawn slightly differently, with the result that some show the right-of-way running to the shore, and some arguably showing the right-of-way stopping at the carriage turn. In resolving ambiguities in easements or rights-of-way, the reviewing entity must look at the facts and circumstances existing at the time of the grant and at the subsequent use by the parties. Waterman v. Waterman, 93 R.I. 344, 351, 175 A.2d 291,295 (1961) (citations omitted). Evidence as to the practical construction of the grant by the interested parties is helpful to sort out ambiguities in the language. Coop. Bldg. Bank v. Hawkins, 30 R.I. 171, 182, 73 A. 617,621 (1909). Moreover, references to known and fixed monuments and boundaries will control in the construction of a deed as the surest indication of the intention of the parties. Segar v. Babcock, 18 R.I. 203,205, 263 A. 257, 257-58 (1893). Such deconstruction is employed because "[t]he location of monuments, whether natural or artificial, is generally quite visible and certain." 14 Powell on Real Property, § 81A.05[3] (Michael Allan Wolf ed., Matthew Bender) (2001).
In the instant matter, the boundaries mentioned in the deeds — Tuckerman Avenue on one side and the Atlantic Ocean on the other — were indeed known and fixed. Further, the maps referenced by the deeds were approximations, as evidenced by their inconsistencies. The more appropriate measuring stick of the facts and circumstances at the time of the grant would be the engineered maps, which clearly depict the right-of-way running from Tuckerman Avenue to the ocean. Therefore, the CRMC's finding that the right-of-way travels from Tuckerman Avenue to the Atlantic Ocean is supported by reliable, probative, and substantial evidence, and is not clearly erroneous.
 PUBLIC ACCEPTANCE
The appellants argue that the CRMC's finding that the public accepted the alleged dedication was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Therefore, the appellants maintain that the finding was arbitrary, capricious, and representative of an abuse of discretion.
Once an incipient dedication has been made by the landowner, an acceptance by the public or the municipality must be tendered for there to be an effective dedication. Robidoux, 120 R.I. at 433, 391 A.2d at 1154. The appellants argue that the testimony from area fisherman, neighbors, and the appellants themselves shows that the public used the instant right-of-way only on occasion and only with the permission of the appellants. Furthermore, the appellants maintain, some of those testifying confused the instant right-of-way with other, adjacent rights-of way. Finally, they argue that the public testimony indicates that the adjacent right-of-way through the Clambake Club property satisfies the public's need to access the shore in the vicinity.
Over the course of the two hearings concerning this matter, the subcommittee heard ample testimony regarding the public's use of the right-of-way to gain access to the coast. (See detailed discussion of this testimony, supra.) A number of fishermen testified that they had used the right-of-way for recreational and commercial purposes for at least 50 years, up until the time that the appellants constructed a fence across the pathway in or around 1981. Additionally, local public officers testified that they observed copious public use over the years, and made it clear to the subcommittee that they considered the instant parcel a public right-of-way. In their reports, both Markoff and Shepard concluded that there had been considerable usage by the general public over a long period of time. Finally, Mr. and Mrs. Spiratos vehemently maintained that the public continuously used the right-of-way despite the owners' attempts to curtail such use. In this light, the appellants' argument that any use was permissive in nature is unavailing. Accordingly, the Court is satisfied that there exists competent evidence in the record to sustain the CRMC's finding that the public accepted the incipient dedication of the right-of-way, and the finding, therefore, did not constitute an abuse of discretion.
 THE ENABLING ACT
Finally, the appellants claim that the CRMC's findings were affected by error and were made in excess of its statutory authority because it applied the wrong standard in reviewing whether there had been a dedication and acceptance of the right-of-way. In 1984, the Rhode Island General Assembly amended the CRMC's enabling act, implementing specific guidelines in reference to the committee's power to designate rights-of-way. The amended section provides the following instruction:
 "In designating rights-of-way, the council shall consider the following matters in making its designation:
 (A) Land evidence records;
 (B) The exercise of domain over the parcel as maintenance, construction, or upkeep;
 (C) The payment of taxes;
 (D) The creation of a dedication;
 (E) Public use;
 (F) Any other public record or historical evidence such as maps and street indexes;
 (G) Other evidence as set out in § 42-35-10.
 "A determination by the council that a parcel is a right-of-way shall be decided by substantial evidence." G.L. 1956 §§ 46-23-6(5)(vi) and 46-23-6(5)(vii), as amended by P.L. 2004, ch. 454, § 1.
The appellants maintain that the CRMC should have applied this standard in the instant matter because the case was remanded in 1993 and new public hearings were held, such that the case essentially started anew. As a result, the appellants argue that the CRMC was obligated to employ the factors set forth above and find "substantial evidence" of intent to dedicate a public right-of-way and of the public's accepting that dedication rather than applying the standard as it existed prior to 1984. Conversely, the CRMC argues that the controlling statute should be that which was in effect in 1981 when this administrative appeal was originally filed. Accordingly, the CRMC contends that the aforementioned provisions are not controlling in the instant case because they were not enacted until 1984.
The Rhode Island Supreme Court has held that the controlling law is that which was in place at the time the appeal is filed. With respect to civil actions generally, "if the General Assembly changes the law while a case is pending appeal, the law in effect at the time of the appeal controls the case." O'Reilly v. Townof Glocester, 621 A.2d 697, 704-05 (R.I. 1993) (citingRekowski v. Cucca, 542 A.2d 664, 666 (R.I. 1988)). Furthermore, pertaining to a remand to an administrative board for a new hearing, "[t]he board shall confine its review to the existing facts and applicable law at the time of its initial decision." Kaveny v. Town ofCumberland Zoning Bd. of Review, 875 A.2d 1, 17 (R.I. 2005). Therefore, "[c]ompliance with 46-23-6(E)(f) is not required with regard to actions filed in the Superior Court prior to the effective date of P.L. 1984, ch. 244, 1."[3] Likewise, in the zoning context, it is well-settled that a substantially complete application is reviewed under the law at the time of filing. See G.L. 1956 § 45-24-44(a) (1999). Furthermore, the 1984 Reenactment did not create a new standard from that in effect at the time of filing; rather, it simply itemized specific parameters for the CRMC to consider in designating public rights-of-way.[4]
Consequently, the Court finds that the CRMC's use of the pre-1984 standard was not affected by error of law or in excess of its statutory authority.
 CONCLUSION
After reviewing the entire record, the Court affirms the CRMC's decision to designate the instant public right-of-way. Reliable, probative, and substantial evidence in the record exists to support the CRMC's findings of fact that there was a dedication to the public and a subsequent acceptance thereof. In addition, the actions taken by the CRMC were not in excess of its statutory authority granted by the General Assembly and were not arbitrary, capricious, or an abuse of discretion. Substantial rights of the appellants have not been prejudiced. Counsel should submit the appropriate judgment for entry.
[1] See § 46-23-20.1(e) (enabling the appointment of subcommittees to conduct hearings); see also § 410.01-4 of the State of Rhode Island Coastal Resources Management Program at 146A-146B (1978) (setting forth the powers of the rights-of-way subcommittee).
[2] The appellants contend that the language in this deed is instructive because, although it is from the same grantor as owned the other two lots at the time, and although the right-of-way is similarly situated, the language in this particular deed, unlike that in the other two, specifically provides for free public access to the ocean (discussed further infra). (January 27, 1993 Hearing Tr. at 24.)
[3] Sartor, 542 A.2d at 1080 n. 5. At the time theSartor decision was issued, this section was denoted as "E". Since then, the General Assembly has re-named it section "5".
[4] The 1980 Reenactment provided that the "council shall be responsible for the designation of all public rights of way to the tidal water areas of the state, and shall carry on a continuing discovery of appropriate public rights of way to the tidal water areas of the state." Section 46-23-6(E) (1980).