DECISION
Stonehenge, LLC, and G. Dale Dulgarian (collectively, Appellants) appeal a decision of the Zoning Board of Review of the City of Providence (Board) issued on August 24, 2007. In its decision, the Board granted a special use permit and two dimensional variances to 2 Euclid, LLC, and Chipotle Mexican Grill, Inc. (collectively, Appellees), to construct a restaurant on the property owned by 2 Euclid, LLC. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 I Facts and Travel
2 Euclid, LLC, (2 Euclid) is the owner of real property located at the corner of Euclid Avenue and Thayer Street in Providence, Rhode Island. This property is also known as Lot 104 on Tax Assessor's Plat 13. The 2738 square-foot property is presently located in a C-2 district, and is occupied by a dilapidated single-family home.[1] The Providence Zoning Ordinance (ordinance) describes a C-2 district as a general commercial district that is "intended for commercial areas that serve citywide needs for retail, services and professional office establishments." Providence Code of Ordinances (Providence Code) § 101.2. A restaurant is a legally permitted use in the C-2 zone when restricted to 2500 square feet or less.
Chipotle Mexican Grill, Inc., (Chipotle or Applicant) has proposed to tear down the existing structure and construct a restaurant on the property. Chipotle initially designed a one-story, 2200 square-foot building. It planned to request variances from the ordinance's parking and setback requirements at this early planning stage.[2] First, it calculated that it would need relief from § 703.2 of the ordinance, which requires one parking space for every four seats in an "eating and drinking" establishment. Chipotle further planned to seek 13.8 feet of relief from § 305.1 *Page 3 
(footnote 10) of the ordinance, which requires that street-level building lines in the C-2 zone be coincident, or sit directly against the lot line, without any setback.[3]
Prior to submitting its application to the Board, Chipotle consulted with the City's Department of Planning and Economic Development (Planning Department) in order to obtain a written recommendation in support of its proposal. At this time, it learned that the City's Comprehensive Plan requires that newly-constructed buildings in the C-2 zone have a minimum of two stories. The Planning Department insisted that Chipotle's proposal meet this requirement so that it would blend in with the existing urban streetscape.
To accommodate this demand, Chipotle altered its original design, and increased the size of the building to 3300 square feet; the additional square footage resulted solely from the construction of the restaurant's second story. This proposed use — an "Eating and/or Drinking Establishment[ ] excluding Entertainment, more than 2,500 sq. ft. GFA" — is a specially permitted use in the C-2 district. Id. at § 303 Use Code 57.1. As such, the revision to the building's design then required Chipotle to obtain a special use permit and the aforementioned variances.
The record indicates that multiple public hearings before the Board on this matter were continued; however, the transcripts of April 24, 2007, and July 12, 2007, contain substantial discussion about the project. Additional facts arising from these hearings will be provided as necessary for the resolution of this matter.
At the end of the Board's July 12, 2007 meeting, the Board approved Chipotle's proposal by a four-to-one vote. The Board's written decision, Resolution 9223, filed on August 24, 2007, granted Applicants a special use permit and two variances — one for relief from the C-2 zone's *Page 4 
setback requirement, and the other, for relief from the parking requirements of § 303 Use Code 57.1. In doing so, the Board allowed the restaurant to operate while utilizing four off-site full-time spaces and eight night and weekend spaces. The restaurant, as approved, would host fifty-five seats indoors and fourteen seats on an outdoor patio. Such a seating capacity normally would require fourteen on-site parking spaces.
Mr. Dulgarian appealed this decision to the Court in a timely manner on September 12, 2007.[4] On October 5, 2007, the Court granted Mr. Dulgarian's motion to consolidate his appeal with another filed by Stonehenge Partners, LLC, which appealed the same decision of the Board. These consolidated matters are now before the Court. *Page 5 
 II Standard of Review
The Superior Court's review of a Zoning Board's decision is governed by § 45-24-69. Subsection (d), in relevant part, provides as follows:
 "The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
The Court's review of the Board's decision is not de novo. See Monroe v.Town of East Greenwich, 733 A.2d 703, 705 (R.I. 1999) (quotingKirby v. Planning Board of Review of Middletown, 634 A.2d 285, 290 (R.I. 1993) (recognizing "`traditional judicial' review standard that is applied in administrative-agency actions"). Instead, its appellate review is limited to an examination of "`the entire record to determine whether `substantial' evidence exists to support the board's findings."'Mill Realty Assocs. V. Crowe, 841 A.2d 668, 672 (R.I. 2004) (quotingDeStefano v. Zoning Bd. of Review, 122 R.I. 241, 241, 405 A.2d 1167,1170 (1979)). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, [or an] amount more than a scintilla but less than a preponderance." Lischio v. Zoning Bd. of Rev. of North Kingstown,818 A.2d 685, 690 (R.I. 2003) (quoting Caswell v. George Sherman Sand andGravel Co., 424 A.2d 646, 647 (R.I. *Page 6 
1981)). Should the Court find that competent evidence exists in the record to support the Board's findings, its decision must be affirmed.Monroe, 733 A.2d at 705.
Questions of law, however, are not binding upon a reviewing court and may be reviewed to determine what the law is and its applicability to the facts. Carmody v. Rhode Island Conflict of Interest Com'n,509 A.2d 453, 458 (R.I. 1986). The Court may reverse the Board's decisions concerning exceptions or variances when it is clear that the board acted arbitrarily and/or abused its discretion. Madden v. Zoning Bd. of Reviewof Warwick, 89 R.I. 131, 134, 151 A.2d 681, 683 (1959).
 III Analysis
The Appellants contend that the Board erred when it granted the special use permit in conjunction with the dimensional variances. They further assert that even if the Board properly granted both forms of relief simultaneously, it failed to make the requisite findings to support said departures from the ordinance. The Appellants also make two challenges to the grant of the dimensional variances: first, that the relief granted was not the least relief necessary; and second, that the denial of the variance did not amount to more than a mere inconvenience because reasonable alternatives for the use of the property existed. The Appellants also argue that the special use permit was not reasonably necessary for the convenience and welfare of the public.
 A The Board's Authority to Grant a Special Use Permit and Dimensional Relief Simultaneously
The Appellants initially contend that the Board acted in excess of its authority when it simultaneously granted a special use permit and two dimensional variances to Chipotle. They rely primarily on Newton v.Zoning Bd. of Review of the City of Warwick, 713 A.2d 239 (R.I. *Page 7 
1998), and various provisions of the General Laws and the City's ordinance in support of this argument. To the contrary, the Appellees assert that Newton is inapplicable to the instant matter, for they are not charged with meeting any special "criteria" set forth in the ordinance prior to being granted a special permit. The Appellees further contend that they met all of the ordinance provisions relating to the issuance of a special permit; the Board made findings to that effect[5]; and as a result, the Board's decision should be upheld.
The Court interprets the provisions of an ordinance in accordance with Rhode Island's well-established rules of statutory construction, as "[i]t is well settled that the rules governing statutory interpretation are equally applicable to the interpretation of an ordinance."Jones v. Rommell, 521 A.2d 543, 544-45 (R.I. 1987); See also Mogony v.Bevilacqua, 432 A.2d 661 (R.I. 1981). Therefore, if the language of an ordinance is clear and unambiguous, it must be enforced as written to give the text its plain and ordinary meaning. See Park v. Rizzo Ford,Inc., 893 A.2d 216, 221 (R.I. 2006) (quoting Gem Plumbing Heating Co.v. Rossi, 867 A.2d 796, 811 (R.I. 2005)). "When a statute is ambiguous, however, [the Court] must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature." Harvard v. Pilgrim Health Care of New Eng., Inc. v.Rossi, 847 A.2d 286, 290 (R.I. 2004).
Section 45-24-42(a) states that the "zoning ordinance shall provide for the issuance of special-use permits approved by the zoning board of review." With respect to granting a dimensional variance alongside this type of relief, a board's authority is limited by § 45-24-42(c), *Page 8 
relating to special permits, and § 45-24-41(d)(2), pertaining to variances. The former reads as follows:
 "The ordinance additionally may provide that an applicant may apply for, and be issued, a dimensional variance in conjunction with a special use. If the special use could not exist without the dimensional variance, the zoning board of review shall consider the special use permit and the dimensional variance together to determine if granting the special use is appropriate based on both the special use criteria and the dimensional variance evidentiary standards." Section 45-24-42(c).
Section 45-24-41(d)(2), provides:
 "The zoning board of review has the power to grant dimensional variances where the use is permitted by special use permit if provided for in the special use permit sections of the zoning ordinance." (Emphasis added.)
These statutory provisions were incorporated into the General Laws after our Supreme Court commented that "a dimensional variance be granted only in connection with the enjoyment of a legally permitted beneficialuse, not in conjunction with a use granted by special permit."See Newton, 713 A.2d at 242 (emphasis in original).
Based on the aforementioned directives, it is clear that the Legislature intended that a special use only could coexist with a dimensional variance when the municipality's ordinance so provides.See Oliveira v. Lombardi, 794 A.2d 453, 457 (R.I. 2002) (quotingWebster v. Perotta, 774 A.2d 68, 75 (R.I. 2001) ("When construing a statute `our ultimate goal is to give effect to the purpose of the act as intended by the Legislature"). Consequently, the municipality's ordinance will dictate whether both forms of relief may be granted at the same time.
Section 902.4 of the City's ordinance addresses the process through which a special use permit is granted. That section provides as follows:
 "Special Use Permits. To authorize, upon application, in specific cases, special use permits, pursuant to section 303 and other applicable provisions of this ordinance. The board may impose such conditions regarding the proposed *Page 9 
building, structure, use or otherwise, as it deems appropriate. To authorize a special use permit, the board must first:
 (A) Consider the written opinion from the department of planning and development.
 (B) Make and set down in writing specific findings of fact with evidence supporting them, that demonstrate that:
 1. The proposed special use permit is set forth specifically in this ordinance, and complies with any conditions set forth therein for the authorization of such special use permit;
 2. Granting a proposed special use permit will not substantially injure the use and enjoyment of nor specifically devalue neighboring property; and
 3. Granting the proposed special use permit will not be detrimental or injurious to the general health, or welfare of the community.
 Providence Code § 902.4.
The special permit section of the subject ordinance does not expressly allow a special use permit and dimensional variance to be issued in conjunction with one another. Although the Legislature has authorized municipalities to consider both forms of relief simultaneously, the City has yet to amend its ordinance to permit this activity; consequently, the ordinance is silent as to the availability of this combined relief. Further, while decided prior to the enactment of the aforementioned provisions, the Newton case nevertheless is relevant to the outcome of this matter.
In Newton, a landowner applied for a special use permit to demolish an existing single-family structure and replace it with a six-unit multifamily dwelling — a use that required a special permit.713 A.2d at 240. The project also required dimensional variances from the minimum lot area, certain lot and parking lines, density requirements, and design and landscaping standards. Id. Our Supreme Court noted that "[t]he ordinance is ambiguous and imperative in requiring that a special use meet all the criteria authorizing such special use."Id. at 242. In that landowner's case, such criteria included those restrictions from which he sought dimensional relief. Id. *Page 10 
Turning to the instant case, § 902.4 explicitly allows the Board to grant a special use permit when that use is permitted by "section 303 and other applicable provisions of the ordinance." The Providence Code employs a "Use Code," or a "classification system designed to limit and aid in the interpretation of the use regulations . . . Each [number] in the use regulations corresponds to a more detailed listing of uses[.]" Providence Code § 301. The Use Code sets boundaries for the range of use available to a particular parcel. See Providence Code, Appendix A. In other words, a special use may be permitted under the ordinance, but it is nonetheless conditional based upon the criteria set-forth therein.See Roland F. Chase, R.I. Zoning Handbook §§ 121-22 (1993). Therefore, each use code found in § 303 of the ordinance must be cross-referenced with other ordinance provisions to determine which restrictions, or range of use, must be incorporated into the specially permitted use.
Here, the use of property in a C-2 zone as a restaurant having an area greater than 2500 square feet is available via a special use permit. This particular use carries a Use Code 57.1 designation and, therefore, must comply with those requirements applicable to property in the C-2 zone, as well as any additional restrictions associated with Use Code 57.1. For example, § 305 sets forth the dimensional regulations which must be followed in each zone. Footnote 10 of § 305 requires that structural lines at street level in the C-2 zone be coincident to the lot line without any setback. Additionally, § 703, entitled "Parking space requirements" designates the minimum number of parking spaces for establishments designated as Use Code 57.1. See Pawtucket Code § 703.2.
The proposal met neither of these criteria. Applicants needed a total of fourteen parking spaces to comply with § 703.2, and the side of the structure fronting Thayer Street, per § 305 (footnote 10), should have been set flush against the lot line. Instead, Chipotle provided four *Page 11 
full-time parking spots and eight part-time parking spots, and proposed placing the structure 13.8 feet away from the lot line.
While these requirements are not characterized as "conditions" or "criteria" in the text of the ordinance, granting a variance to circumvent these restrictions would render them irrelevant. SeeNortheastern Corp. v. Zoning Bd. of Review of the Town of NewShoreham, 534 A.2d 603, 605 (R.I. 1987) (stating deviation from dimensional requirements comes into play only when project involves permitted use, not one granted via special exception). All structures with uses falling under Use Code 57.1 are designed to share similar characteristics, which include the setback and parking requirements at issue in this case. Ignoring this range of use when specially permitted, effectively would allow a dimensional variance to trump the contemplated restrictions which attach to Use Code 57.1, as it is already a regulated use in the C-2 zone. As in Newton, the City's ordinance requires compliance with dimensional mandates before a special use permit may be granted. Likewise, the criteria which are required by the ordinance are exactly those for which Chipotle sought a variance. Consequently, the Board erred in granting Chipotle a special use permit while simultaneously granting two variances. See Newton, 716 A.2d at 242.
As previously noted, a special use permit may be granted simultaneously with a variance only if a municipality's ordinance so provides. Because the City's ordinance does not reflect the most recent amendment to § 45-24-42(c), which would have permitted the Board to grant a special use permit in conjunction with dimensional relief, the Court concludes that the Board exceeded its authority in approving Chipotle's proposal to construct a restaurant greater than 2500 feet in area, which would not only violate the setback requirements of the C-2 zone, but also fail to provide a sufficient number of parking spaces. *Page 12 
 B The Other Requested Relief
Even assuming arguendo that the Board properly granted a special use permit while considering both dimensional variances, [6] the Court will address the propriety of the granting of the dimensional variances. In granting any variance, the Board must find evidence to satisfy the following requirements:
 "(1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant, excepting those physical disabilities addressed in § 45-24-30(16);
 (2) That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
 (3) That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of the zoning ordinance or the comprehensive plan upon which the ordinance is based; and
 (4) That the relief to be granted is the least relief necessary. Section 45-24-41(c); See also Providence Code § 902.3 (echoing same requirements).
When granting a dimensional variance, the Board also must determine
 "that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted is not grounds for relief. . . ." Section 45-24-41
(d).[7] *Page 13 
With respect to modifying on-site parking requirements, the Board must find that "the conditions or circumstances provide substantial reasons to justify such action." See Providence Code § 707.1. It must do so after "[t]he recommendation of the traffic engineer shall be requested in each case" although "such recommendation shall only be advisory."See id.
"[A] municipal board, when acting in a quasi-judicial capacity, must set forth in its decision findings of fact and reasons for the actions taken." JCM, LLC v. Town of Cumberland Zoning Bd. of Review,889 A.2d 169, 176 (R.I. 2005) (citations omitted). A zoning board's findings cannot be merely "conclusional, and the application of the legal principles must be something more than the recital of a litany."Kaveny v. Town of Cumberland Zoning Bd. of Review, 875 A.2d 1, 8 (R.I. 2005) (quoting Bernuth v. Zoning Bd. of Review of New Shoreham,770 A.2d 396, 401 (R.I. 2001)). In the absence of sufficient factual findings and conclusions of law, "the Court will not search the record for supportive evidence or decide for itself what is proper in the circumstances."Id.; See also Block Island Power Co. v. Pub. Utilities Comm'n,505 A.2d 652, 654 (R.I. 1986) (observing "[i]f the [agency], however, fails to provide sufficient findings and evidence upon which it has based its decision, [the court] shall not speculate thereon or search the record for supporting evidence or reasons, nor shall [it] decide what is proven."). *Page 14 
"Detailed and informed findings of fact are a precondition to meaningful administrative or judicial review." JCM, LLC,889 A.2d at 176.
 1 Parking Relief
The Appellants challenge the Board's issuance of both variances to the Applicants. Specifically, with respect to the parking variance, the Appellants assert that the relief given was not the least relief necessary.[8] In crafting its findings on the parking relief, the Board ultimately stated as follows:
 "1. The Applicant has clearly shown that the hardship from which relief is sought is due to the unique characteristics of the Property, in that it is a very small lot (only 2,738 square feet) in the C-2 zone with insufficient room to provide parking for any commercially-viable use. The Board bases this finding on the uncontested expert testimony of Mr. Shamoon and Mr. Sweeny, as well as the personal knowledge of the Board. The Board further finds that the hardship is not due to a physical or economic disability of the Applicant, as the Applicant asserted none.
 2. The Applicant has clearly shown that the hardship is not the result of any prior action of the Applicant or Owner and does not result primarily from the desire to realize greater financial gain. The Owner testified of its unsuccessful attempts to rent out the existing building on the property to a quality tenant. The Owner has a considerable investment in neighboring property on the same block and desires to protect that investment. The Owner also participates in several community improvement initiatives in the neighborhood and wants to eliminate this eyesore.
 3. The Applicant has shown that the granting of the requested relief will not alter the general character of the surrounding area, as the use is permitted by special use permit within the C-2 zone, and the Property is located on a well-traveled street already containing a significant mixture of retail, institutional and residential uses. More specifically, the character of the surrounding area is that of a pedestrian nature, with a great number of students from the local university on foot, and with existing commercial establishments without significant amounts of off-street parking. The Board acknowledges that both the Applicant and the remonstrants gave substantial testimony as to what the true character of the neighborhood is, residential or commercial? [sic] The *Page 15 
Board finds that the character of the surrounding area is that of a mixed use, with the subject Property being in the C-2 zone and thus entitled to deference for its commercial use. Even one of the remonstrants, Ms. Breed, referred to the commercial area as being "embedded" in the residential area. The Board is also persuaded by the unopposed expert testimony of Mr. Shamoon and Mr. Sweeney. The Board is further guided by the testimony of Mr. Toothman, whom the Board finds credible with respect to the high percentage of customers who will walk rather than drive to this restaurant. The participation by the Applicant in the meal plan for the local university further supports this finding.
 * * *
 5. The Applicant has shown that the granting of the requested relief will not impair the intent or purpose of the Zoning Ordinance or the Providence Comprehensive Plan. The Board bases this finding on the expert testimony of Mr. Shamoon and on the recommendation of the Department of Planning and Development as evidenced by its written recommendation submitted to the Board and made a part of the record.
 6. The Applicant has shown that the relief requested is the least relief necessary in order for the hardship to be alleviated. The Applicant and Owner made several changes and improvements to the plans during the extended hearing process, which improved the design (by the removal of the bump-out for the trash), mitigated impacts on the neighborhood (by the redesign and landscaping improvements on the adjoining property owned by the Owner), and reduced the relief necessary (by reducing the overall number of seats to 55, by providing 8 after-hours and weekend spaces on adjoining property, and by providing 4 full-time off-site parking spaces).
 7. The Board further finds that the Applicant has shown that the hardship that will be suffered if the dimensional variance is not granted shall amount to more than a mere inconvenience. Mr. Sweeney's uncontested expert testimony, the Owner's testimony concerning the difficulty in renting the existing building on the property, and the Board's personal knowledge and observation of the long-standing dilapidated condition of such building, leads to this finding. The Board is convinced that no viable commercial use will come forward for this C-2 property without requiring similar relief.[9]
 * * *
 11. As to both the dimensional variance and the special use permit, the Board has considered the written recommendation of the Department of Planning and *Page 16 
Development and agrees with such recommendation, and has incorporated its suggestions herein."[10] Resolution 9223, Aug. 24, 2007 (Zoning Board Decision), at 2-4.
Based on these findings, Appellants urge that the parking relief granted was not the "least relief necessary" for a "minimal to a reasonable enjoyment of the permitted use to which the property is proposed to be devoted."See Standish-Johnson Co. v. Zoning Bd. of Review ofPawtucket, 103 R.I. 487, 492, 238 A.2d 754, 757 (1968).
Our Supreme Court has recognized that the least relief necessary is that which ameliorates the hardship which justifies the variance.See Lincoln Plastic Prods. v. Zoning; Bd. of Review of the Town ofLincoln, 104 R.I. 111, 114, 242 A.2d 301, 303 (1968) (stating a board's "authority to act favorably is limited to the extent of relief demonstrated to be reasonably necessary to the enjoyment of the permitted use sought to be served"); See also 3 Rathkopf, The Law ofZoning Planning § 58:1 (recognizing "the variance is a means of correcting the occasional inequities that are created by general zoning ordinances"). In this case, the Board has concluded that the proposed use — a restaurant, commercial by nature — could not exist without relief from the parking ordinance. In fact, the Board concluded that any viable commercial use would not be possible without parking relief. Consequently, the Board issued a variance to provide for this relief.
While Appellants faulted the Applicant for failing to provide a traffic study, the Court finds this fact inconsequential to the Board's determination. Although the language of the ordinance states that a traffic study "shall" be requested, it also indicates that such a recommendation is "advisory" only. See Providence Code § 707. Therefore, the Court concludes that it is within the Board's discretion to consider those facts and conclusions *Page 17 
presented within a study when making its determination. The failure to provide a traffic study, alone, will not void the Board's conclusions.See Gryguc v. Bendick, 510 A.2d 937 (R.I. 1986) (supporting directory, rather than mandatory, interpretation when sanctions for failure to meet a particular requirement are absent from the statutory scheme).
The record reveals that the Board was aware of the "traffic problem" in the Thayer Street corridor, and sought evidence that the proposed Chipotle would not exacerbate the problem. (Tr. 7/12/07, at 55.) The record also reveals that the Board considered numerous factors in assessing the requested parking variance without a study. It considered Mr. Toothman's estimate of the percentage of clientele that would be expected to walk to the location; Mr. Shamoon's recitation of the goals of the City's interim Comprehensive Plan; the Planning Department's recommendation; and its own knowledge of the neighborhood.
The Board heard testimony from Mr. Toothman, through which he predicted that forty-five to sixty-five percent of Chipotle's customers would walk to the location. (Tr. 4/24/07, at 171.) During the lunch hour, he estimated that this percentage would rise to approximately seventy-five percent, based on an incoming estimate of 75 to 100 visitors between 11:30 a.m. and 1:30 p.m. (Tr. 7/12/07, at 43-44.) The Board independently recognized that Chipotle's participation in Brown's meal plan would produce a high percentage of foot-traffic at this location. See Resolution 9223, at 3, ¶ 3. The Board also stated that "the character of the surrounding area is that of a pedestrian nature, with a great number of students from the local university on foot and with existing commercial establishments without significant amounts of off-street parking." Id.
In addition, Mr. Shamoon's report indicated that allowing the project to proceed without the required number of parking spots would support the goals of the City's Comprehensive Plan. *Page 18 
He stated that the "new urbanism" and "sustainable development" principles of the plan are designed to encourage pedestrian scale and less reliance on automobiles and surface parking lots. Mr. Shamoon also concluded that "[t]he proposed development at the subject site would be totally infeasible if the parking variance were not granted. Even paving over adjacent lots is undesirable in the Thayer Street corridor." During testimony, he also stated that the Comprehensive Plan was aimed at encouraging the development of essential commercial services and facilities within walking distance of the neighborhood's residents. (Tr. 7/24/07, at 183.)
In another report, Mr. Sweeney opined that a parking variance was the least relief necessary because it would permit the applicant to redevelop the site with a use that is consistent in size and scope with adjacent properties and their uses. He further testified that developing a viable commercial use on this C-2 lot, while also providing on-site parking, would not be economically feasible. (Tr. 7/24/08 at 193.) Mr. Sweeney also confirmed that to provide parking on-site, the first floor of such a development would be comprised of parking, and the stories above would provide the commercial use. Id. This would result in parking fronting on both Thayer Street and Euclid Avenue. Id.
The Planning Department, too, recommended that the parking variances be granted. Planning Dep't Report, Apr. 24, 2007. It also stated that the Thayer Street area has been subject to heavy foot-traffic.Id. In an earlier report, the Department noted that the Thayer Street area is well-served by mass transit, and parking typically is not provided for commercial establishments in the vicinity. Planning Dep't Report, Mar. 27, 2007.
The Board recognized that the Thayer Street area is plagued with traffic problems; however, it also recognized that some relief must be granted in order to make viable the use of *Page 19 this property in the C-2 zone. Any failure by the Board to consider downsizing the building in order to reduce the number of required parking spaces, would be insignificant to its decision. If any
commercial use would fail to produce a commercially viable endeavor without parking, the size of the building itself, whether exactly 2500 square feet — as permitted by the ordinance as of right — or, 2501 square feet — which requires a special use permit — would not affect the need for a parking variance, as evidenced by the record. The only testimony suggesting that the footprint of the building could accommodate more parking spaces was that of Mr. Dulgarian, the Appellant in this matter. That testimony was implicitly rejected by the board. Instead, after concluding that four full-time and eight part-time parking spaces would balance the Applicant's relief against the needs of the community, the Board granted the parking variance. It, therefore, recognized that certain factors mitigated the need to provide the number of spaces required by the ordinance.
Pursuant to § 45-24-69, "this Court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact." Here, in "weighing the evidence on questions of fact," the Board had competent evidence before it, including the recommendation of the Planning Department and the testimony of Applicant's expert witnesses, as well as its own knowledge of the area, to substantiate the findings pertinent to the granting of the parking variance. Therefore, the Court observes that had the Board possessed the authority to grant the special use permit and the dimensional variances contemporaneously, the issuance of the parking variance would have been supported by the Board's finding that the parking variance was the least relief necessary. *Page 20 
 2 The Setback Relief
The Appellants also challenged the Board's grant of a dimensional variance with respect to the setback provisions governing structures in the C-2 zone on the same grounds as it had challenged the issuance of the parking variance — the relief was not the least relief necessary. In addition, the Appellants aver that the denial of the dimensional relief on the Euclid lot line would not be more than a mere inconvenience to the Applicant.
While the Board's overall findings do not constitute a boilerplate recitation of the statutory prerequisites for obtaining dimensional relief, its findings with respect to certain variance prongs are deficient. See JCM, LLC, 889 A.2d at 176 (requiring factual findings to support judicial review). The Board's findings with regard to the 13.8 foot setback relief lack the necessary detail for this Court to have performed any type of meaningful analysis on appeal. Kaveny,875 A.2d at 8 (acknowledging Court need not search the record for support for the Board's findings). For example, the Board only specifically discusses the Applicant's request for relief from the coincident lot-line requirement of § 305.1 (footnote 10) in paragraph four of the Board's eleven factual findings. This particular finding provides:
 "[t]he setback from the lot line on Euclid Avenue will be compatible with the surrounding area, as it will match the setbacks of the existing buildings on Euclid Avenue, while at the same time providing a hard urban edge via the patio fence. Finally, the Board's own knowledge of the Property and the neighborhood through its inspection of the area in connection with this case and also through its repeated inspections and hearings in connection with the many other cases from the immediate neighborhood that have come before the Board in recent years, leads the Board to find that the general character of the surrounding area will not be altered."
This paragraph only references the third prong of both § 45-24-41 and § 902.3(A)(3) in relation to satisfying the standards for obtaining a variance; paragraph four pertains strictly to the proposal's impact on the general character of the neighborhood. *Page 21 
Further, in commenting elsewhere on the variances, the Board failed to specify which form of relief it was considering — the variance involving the setback, the variance involving parking, or both. See Resolution 9223, Aug. 24, 2007 (Zoning Board Decision), at 3, ¶ 5 (acknowledging "requested relief is least relief necessary); See also Id. at ¶ 7 (addressing "more than a mere inconvenience" prong of variance test with respect to "the dimensional variance") (emphasis added). In discussing the "mere inconvenience" requirement of the variance provisions of the ordinance, the Board also failed to state whether its reasoning was applicable to the setback requirement as well as the parking variance. As mentioned supra, the "mere inconvenience" discussion largely mirrors paragraph one of the Board's decision, which is directed at addressing the Applicant's hardship with respect to the parking variance. Consequently, the Court cannot evaluate the propriety of the Board's findings with respect to the setback variance, including whether the 13.8 feet of relief issued indeed was the least relief necessary.
 3 The Special Use Permit's Impact on the Community
The Appellants make a final argument with respect to the Board's findings. They contend that the issuance of the special permit was deficient because it was not reasonably necessary to the health and welfare of the community. It should be noted that the Court can find no provision in the special use section of the ordinance which requires that a particular special use be "reasonably necessary for the convenience and welfare of the public." See Appellants' Mem. in Support, at 35.
Presumably, this challenge arises from § 902.4(B)(3) of the ordinance, which requires that the Board make factual findings demonstrating that "[g]ranting the proposed special use permit will not be detrimental or injurious to the general health, or welfare of the community." *Page 22 
The Court must assume as much, since Appellants quote Toohey v.Kilday, 415 A.2d 732 (R.I. 1980) in support of this same proposition.[11] This requirement has been incorporated into the City's ordinance by the plain language of § 902.4(B)(3), and is therefore, a condition precedent to obtaining a special use permit.
Whether an applicant has satisfied a condition precedent to obtaining a special use permit is a question of fact for the Board. With respect to this particular requirement, the Board commented as follows:
 "[a]s to the special use permit, the board finds that the proposed use will not be detrimental or injurious to the general health, or welfare of the community. The Board bases this finding on the testimony of Mr. Shamoon and Mr. Sweeney as to the compatibility with the neighborhood and the Comprehensive Plan. The Board finds that the proposal will benefit the general welfare of the community by replacing the existing deteriorated structure with a vibrant commercial use that is consistent both in use and in form (two-stories and built to the Thayer Street lot line) with the neighborhood and the Comprehensive Plan. The Board further finds that the off-site mitigation measures imposed by the owner, as to the landscaping and redesign of the neighboring parking area and the planting of street trees, will also benefit the health and welfare of the community." Resolution 9223, Aug. 24, 2007 (Zoning Board Decision), at 4, ¶ 10.
In making this finding, the Board considered the testimony of Mr. Shamoon and Mr. Sweeney, in addition to the Planning Department's recommendations. See Id. at ¶ 11. Both experts felt that the proposal would enhance the Thayer Street Commercial district.
Mr. Shamoon testified that the area is a vibrant commercial district, and the proposed Chipotle restaurant fits well within its existing framework. (Tr. 4/24/07, at 185.) He also *Page 23 
commented that the degree of use — 3300 square feet, as proposed — created a 35% increase in the existing restaurant size permitted as of right. Id. at 182. He added, however, that this deviation was "not significant in terms of compliance with the intent and spirit of the Comprehensive Plan."Id. He further noted that the proposal supported the plan's goals of "cluster pattern" development, which would focus future development along major arterials in select areas, as opposed to "strip development."Id. at 183. Mr. Sweeney echoed Mr. Shamoon's sentiments, and stated that the restaurant itself was a specially permitted use in the zone, and would not be injurious to the health and welfare of the community. Id. at 196. In his report, he also stated that because of its size and scope, it would be consistent with other uses on adjacent properties.
The Board additionally considered the proposed use's compatibility with the City's Comprehensive Plan. In his report, Mr. Shamoon specifically referenced the plan's goals, one of which included supporting the creation and growth of businesses that enhance the vitality of life in the City's neighborhoods. Additionally, he stated that the plan would encourage pedestrian traffic. It is clear that the Board considered the project's aesthetic impact on the community's welfare. The experts' commentary indicated that a project that encouraged pedestrian traffic thereby would deter private transportation to the area and hinder the construction of undesirable parking lots to accommodate local traffic. Further, the Board found that other aspects of the project — a new building itself, the landscaping, and the utilization of the owner's adjacent land for parking — would enhance the community's existing welfare.
Mr. Dulgarian testified in opposition to the project, as did others, largely with respect to the neighborhood's parking situation. The Board recognized his concerns, but acknowledged that similar problems would result with other uses proposed in the Thayer Street area. However, *Page 24 
with respect to satisfying the ordinance's requirements, the Board heard relevant testimony from two qualified expert witnesses. See ThomsonMethodist Church v. Zoning Bd. of Review of the City of Pawtucket,99 R.I. 675, 681, 210 A.2d 138, 142 (1965) (recognizing "a zoning board's decision will not be disturbed if there is any legally competent evidence upon which it may reasonably rest"). No conflicting expert testimony was offered by Appellants. Mr. Dulgarian's testimony amounted to a lay opinion, which has little probative force against the experts' statements. See Smith v. Zoning Bd. of Review, 103 R.I. 328, 334, 237 A.3d 551, 554 (1968). As such, the Court cannot afford great weight to that testimony to disturb the Board's finding that the proposed use will not affect the general health or welfare of the community in a detrimental or injurious manner.
This Court observes that the record provided the Board with substantial evidence demonstrating that the proposed use would not have an inimical effect upon the public health or welfare of the community. Therefore, Applicants have satisfied § 902.4(B)(3) of the ordinance. Had the Board permissibly granted Applicant a special use permit in conjunction with the variances, its finding with respect to this prong of the special use section of the ordinance would have been supported by legally competent evidence in the record.
 IV Conclusion
Upon a review of the entire record, this Court finds that the Zoning Board of Review for the City of Providence improperly granted Chipotle's application for a special use permit in conjunction with dimensional relief. Accordingly, the decision of the Board is reversed. Counsel shall submit an appropriate order for entry.
[1] The building currently standing on the site is wood-framed and two-stories high. The building once served residential purposes, and later had a commercial use for several years. It currently is vacant.
[2] At one time, Chipotle also requested relief from the ordinance with respect to the placement of trash receptacles; however, this relief became unnecessary after Chipotle revised its plan.
[3] Section 305.1(10) provides, in relevant part, that "[i]n the C-1 and C-2 zones, building lines at street level shall be coincident with the lot line without setback and main entrances shall be oriented to face the street. . . ."
[4] The Appellees assert that Mr. Dulgarian has not been "prejudiced" by the decision of the Board and, therefore, cannot seek relief from this Court. Further, they allege that Mr. Dulgarian is not entitled to relief by alleging that he is "aggrieved." On September 18, 2008, the parties appeared before the Court for oral argument. At that hearing, the Appellees withdrew their assertion that Mr. Dulgarian lacked standing to pursue this appeal because he is not an "aggrieved party." Notwithstanding the withdrawal of this assertion, the Court nevertheless will address the issue of aggrievement.
"Prejudice" and "aggrievement" for the instant purpose are entirely different concepts. Section 49-24-69(d) of the General Laws addresses the relief that may be awarded by the Court — a reversal or modification of the Board's decision — in the event that it finds that "substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions" made by the Board. However, § 49-24-69(a) also sets forth the parameters for appealing a zoning board's decision. It states that "[a]n aggrieved party may appeal a decision of the zoning board of review to the superior court. . . ."See § 49-24-69(a). An aggrieved party is defined, in § 49-24-31(4), as "(i) [a]ny person or persons or entity or entities who can demonstrate that their property will be injured by a decision of any officer or agency responsible for administering the zoning ordinance of a city or town; or (ii) [a]nyone requiring notice pursuant to this chapter."
Mr. Dulgarian, in his capacity as the trustee of the Krikor S. Dulgarian Real Estate Trust of December 22, 1960, indicated that the trust was entitled to receive notice of the proceedings before the Board because it owns the premises situated at 252-258, 260, and 262-268 Thayer Street. He, therefore, is "aggrieved" per § 49-24-31(4). However, even if the property was not within the 200 foot radius of the proposed project and the trust was not entitled to notice, Mr. Dulgarian, as trustee, would still meet the statutory test for "aggrievement." "A property owner is aggrieved within the purview of [the] statute when the property of which he is the owner is devoted to a use that would naturally be affected adversely by a decision granting an exception or a variance applicable to the land of another." D'Almeida v. Sheldon RealtyCo., 105 R.I. 317, 319, 252 A.2d 23, 24 (1969) (quoting Flynn v. ZoningBoard of Review, 71 R.I. 118, 122, 73 A.2d 808, 810 (1950));See also Coventry Zoning Bd. of Review v. Omni Dev't Corp.,814 A.2d 889, 897 (R.I. 2003). Further, aggrievement may be established by demonstrating that the appellant's property is in close proximity to the land at issue. Dilorio v. Zoning Board of Review, 105 R.I. 357, 360,252 A.2d 350, 353 (1969). The proximity of the trust's property to the Appellees' proposed redevelopment, the alleged harm caused by the excessive traffic congestion, and the Applicant's request for not only a special use permit, but also two variances, all combine to constitute adequate allegations of injury to the properties at 252-258, 260, and 262-268 Thayer Street. D'Almedia, 105 R.I. at 319, 252 A.2d at 24. As a result, the Court finds that even had the Appellees not withdrawn their assertion that Mr. Dulgarian lacked standing, they would not have prevailed on that issue because Mr. Dulgarian's appeal of the Board's decision is properly before the Court.
[5] After reviewing the Planning Department's recommendation, the Board found that "the special use permit for a restaurant exceeding 2500 square feet is specifically set forth at Section 303-use code 57.1 for the C-2 zone." Based on the testimony of a community planning expert, a real estate expert, and its own knowledge of the area, the Board found that the proposed special use was in harmony with the Thayer Street area. The Board determined that granting the special use permit would neither injure the use and enjoyment of the neighboring property, nor devalue it. The Board also determined that the proposed use would not be detrimental or injurious to the general health or welfare of the community.
[6] Section 707 of the ordinance allows the Board to grant a special exception — commonly called a special use permit — to modify, upon application, the parking conditions set forth in the ordinance. The Court is of the opinion that the relief allowed by this section would constitute a dimensional variance rather than a special use. First, parking not only is a permitted use on this property, it isrequired per § 703.2 of the ordinance. Further, in its decision, the Board evaluates the Applicant's request under the standards set forth in § 42-24-14 of the General Laws and § 902.3 of the ordinance, which both address variances. See Resolution 9223, Aug. 24, 2007 (Zoning Board Decision), at 2-4.
[7] The Court observes that § 902.3 regarding the Board's approval of dimensional variances states as follows:
 "The board shall, in addition to the above standards, require that evidence be entered into the record of the proceedings showing that: . . .[i]n granting a dimensional variance, that the hardship that will be suffered by the owner of the subject of the property if the dimensional variance is not granted shall amount to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted shall not be grounds for relief." (Emphasis added.)
The Court notes that this section of the ordinance does not reflect the amended requirements of § 45-24-41. Our Supreme Court has commented that in 2002, this section of the General Laws reinstated the judicially created doctrine that a property owner need only show an adverse impact on his or her property that amounted to more than a mere inconvenience, rather than a loss of all beneficial use of a piece of land absent a variance, in order to be eligible for relief. See Lischio v. Zoning Bd.of Review of the Town of North Kingstown, 818 A.2d 685 (R.I. 2003);See also P.L. 2002 ch. 197, § 1; P.L. 2002, ch. 218, § 1; P.L. 2002, ch. 384, § 1) (deleting portion of § 45-24-41 which described "more than a mere inconvenience" as "no other reasonable alternative to enjoy a legally permitted beneficial use of one's property"). The recent amendment was effective when the Appellees applied for zoning relief and, therefore, applies to the instant matter. By amending the statute, the Legislature effectively amended the Providence ordinance.See Lischio, 818 A.2d at 691-92.
[8] The Court notes that Appellants challenge the Board's finding with respect to its analysis of the "more than a mere inconvenience" prongs of § 42-24-41 and § 902.3 of the ordinance, but that this challenge, as briefed to the Court, only is applicable to Applicant's request for setback relief. See Appellants' Mem. in Support, at 33-34.
[9] The Court observes that while this particular finding does not explicitly address the site's parking situation, it mirrors the language in paragraph one of the Board's findings, which discusses the owner's inability to employ an economically-viable use on the site should the parking relief not have been granted.
[10] With respect to paragraph eleven of the Board's findings, the Court observes that the Planning Department's recommendations, dated March 27, 2007, and April 24, 2007, address both requested variances.
[11] The Toohey Court stated that in requesting a special use permit, "the applicant need only show that `neither the proposed use nor its location on the site would have any detrimental effect upon the public health, safety, welfare, and morals." In Toohey v. Kilday, 415 A.2d 732
(R.I. 1980), the provision at issue required as a condition precedent to the grant of a special exception, that an applicant establish the relief requested was reasonably necessary for the convenience and welfare of the public. 415 A.2d at 735. In interpreting this provision, the Court stated that "[a] zoning board of review, however, may not deny granting a special exception to a permitted use on the ground that the applicant has failed to prove that there is a community need for its establishment. To satisfy the prescribed standard, the applicant need show only that `neither the proposed use nor its location on thesite would have a detrimental effect upon public health, safety, welfare, and morals."Id. at 735-36 (emphasis in original) (citations omitted).